O

# United States District Court
# Central District of California

| | |
|---|---|
| MARS ADVERTISING, INC., <br><br> Plaintiff, <br><br> v. <br><br> XMARS CORP. et al., <br><br> Defendants. | Case № 2:24-cv-03475-ODW (PVCx) <br><br> **ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION [19]; AND DENYING REQUEST FOR LEAVE TO FILE NEW EVIDENCE [71]** |

## I. INTRODUCTION

Plaintiff MARS Advertising, Inc. ("MARS"), a traditional advertising agency that provides marketing and e-commerce services using the trademark "MARS," brings this trademark infringement action against Defendants XMars Corp., SparkX Global Corp., and SparkX Marketing Co., Ltd. (collectively "Defendants"), which also provide e-commerce advertising services under the trademark "XMARS." (*See* Compl., ECF No. 1.)  MARS moves for a preliminary injunction prohibiting Defendants' use of the "XMARS" Mark to market and sell the same services offered by MARS through the same channels of trade.  (Mot. Prelim. Inj. ("Motion" or "Mot."), ECF No. 19.)  On September 10, 2024, the Court heard argument and received evidence from the parties.  (Mins., ECF No. 70.)  For the reasons that follow, the Court **GRANTS** the Motion.  (ECF No. 19.)

## II. BACKGROUND

Due to the complex nature of intellectual property disputes, the background is divided into two sections: (1) a general "factual background" of the parties, a brief discussion of the two marks currently in dispute, and a comparison of services that MARS and Defendants offer; and (2) a "procedural background" addressing the relevant filings in this matter.

### A. Factual Background

MARS has operated as an advertisement agency—using "MARS" as a trademark continuously and exclusively—for the past fifty-two years. (Mot. 1.) MARS owns registrations for the following trademarks for use in connection with their advertisement, marketing, and e-commerce services:

| Reg. No. | Mark | Date Registered | Goods/Services |
|---|---|---|---|
| 2008113 | MARS | October 15, 1996 | Advertising agency (Class 35) |
| 3687192 | •MARS | September 22, 2009 | Advertising agency services (Class 35) |
| 4613927 | THEMARSAGENCY (stylized) | September 30, 2014 | Advertising and marketing services (Class 35) |
| 4657754 | THE MARS AGENCY | December 16, 2014 | Advertising agency services; advertising and marketing services; shopper marketing services (Class 35) |

(Mot. 3.)

MARS also owns the MARS UNITED and MARS UNITED COMMERCE word marks and the following MARS UNITED COMMERCE design marks (together with the registrations above, the "MARS Marks"). (Compl. ¶ 21; Mot. 3–4.)




(Mot. 12.)

Defendants began using the "XMARS" Mark on or around Fall of 2022. (Opp'n 1, ECF No. 35.) Through the "XMARS" Mark, Defendants offered a range of "ad technology tools" to brands, third-party sellers, and advertising agencies, to increase sales on the Amazon Marketplace. (*Id.*) Defendants offer similar or near-identical e-commerce advertising and marketing services as MARS under the "XMARS" Mark:

| Plaintiff's Marks | Defendants' Marks |
|---|---|
| MARS | XMARS |
| MARS | xmars |

(Mot. 7.) The parties present several examples of how MARS and Defendants both use their respective marks. This is the actual side-by-side comparison of the two marks (in their current brand logo format):

(Mot. 12.)

While the stylized Marks may at first glance seem dissimilar, when the two marks are searched online or appear on website databases and in print, the similarities are obvious. For instance, when typed, "MARS" and "XMARS" appear virtually identical and, when spoken, sound virtually identical. The two marks differ by a single letter, "X," and when searched in online databases, the two marks frequently appear in the same search results. One example is the "Amazon Ads Partner Directory," through which MARS and Defendants both offer services. (Opp'n 2; Reply 3, ECF No. 39.) A search for "mars" in the "Amazon Ads Partner Directory," provides MARS and "XMARS" as the first two advertisement partners to appear:



(Reply 3.) With regard to the goods and services MARS and Defendants' "XMARS" offer, the Amazon Ads Partner comparison feature provides a clear picture of the near identical range of services:

| Mars United Commerce | XMars |
|---|---|
| **Media planning and buying** | **Media planning and buying** |
| Campaign setup | Campaign setup |
| Campaign management and optimization | Campaign management and optimization |
| Campaign monitoring | Campaign monitoring |
| Campaign reporting and analytics | Campaign reporting and analytics |
| Audience management and engagement | Audience management and engagement |
| **Creative and brand experience** | **Creative and brand experience** |
| Photography | Photography |
| Video production | Video production |
| Audio ads production | Audio ads production |
| Rich media | Rich media |

(*Id.* at 4–5.)[1]

[1] This is only a small portion of the near-identical services that MARS and Defendants via "XMARS" offer.

**B.     Procedural Background:**

On April 24, 2024, MARS sent Defendants a cease-and-desist letter demanding Defendants discontinue their infringement of MARS's trademarks. (Decl. Robert E. Hough, II ("Hough Decl."), Ex. Y ("Cease & Desist Letter" or "Letter"), ECF Nos. 19-1, 19-26.) To be specific, MARS demanded that Defendants "[s]top all use and promotion of 'XMARS' . . . in connection with marketing, advertising, consulting and related goods and services." (Letter 2.) The letter provided Defendants with forty-eight hours to respond before MARS would file suit. (*Id.*) Defendants acknowledged receipt of the Letter twice, but were unable to retain legal counsel and formally respond to MARS within the time allotted. (*See* Mot. 8; Opp'n 18.)

On April 26, 2024, MARS filed this action. (*See* Compl.) MARS alleges five causes of action for: (1) trademark infringement under 15 U.S.C. § 1114; (2) false designation of origin and false descriptions and representation under 15 U.S.C. § 1125(a); (3) trademark infringement and unfair competition under state common law; (4) cancellation of federal trademark registration under 15 U.S.C. § 1119; and (5) cyberpiracy pursuant to 15 U.S.C. § 1125(d). (*Id.* ¶¶ 38–72.)

On May 17, 2024, MARS filed the instant Motion seeking to:

- Prohibit Defendants from using MARS or "XMARS" Marks to designate the source of any advertising, marketing, or e-commerce-type services;
- Prohibit Defendants from stating or suggesting that Defendants' services originated with MARS, or that there is any affiliation or connection between MARS and Defendants and their respective services;
- Order Defendants to file proof of compliance within fifteen days to the Court.

(MARS Proposed Order ISO Mot., ECF No. 19-36.) The Motion is fully briefed. (Mot.; Opp'n; Reply; Surresponse,[2] ECF No. 61 (sealed); Surreply, ECF No. 66.)

---

[2] Defendants actually sought to file a "surreply," but for clarity and correctness, the Court refers to Defendants' filing as Defendants' "Surresponse."

On September 10, 2024, the Court heard argument and received evidence from both sides. (*See* Mins.) In addition to the documentary exhibits received, the Court heard the un-noticed testimony of Ken Barnett, MARS's executive representative. The Court notes that it does not and need not rely on Barnett's testimony, as the Court resolves the Motion on other grounds.

### III. LEGAL STANDARD

A court may grant preliminary injunctive relief to prevent "immediate and irreparable injury." Fed. R. Civ. P. 65(b). To obtain this relief, the plaintiff must establish: (1) a likelihood of success on the merits; (2) a likelihood that he will suffer irreparable harm if the preliminary relief is not granted; (3) that the balance of equities tips in his favor; and (4) that the injunction is in the public interest (the "*Winter* factors"). *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Under the Trademark Modernization Act of 2020, a plaintiff seeking an injunction to prevent trademark infringement is entitled to a rebuttable presumption of irreparable harm upon a finding of likelihood of success on the merits. *Cisco Sys. v. Wuhan Wolon Commc'n Tech. Co.*, No. 5:21-cv-04272-EJD, 2021 WL 4962661, at *7 (N.D. Cal. July 23, 2021); *cf. Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 612 n.3 (9th Cir. 1989 ("In trademark infringement or unfair competition actions, once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted").

The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The burden of demonstrating the need for a preliminary injunction rests with the moving party. *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994). The moving party must meet this burden with a "clear showing" that the preliminary injunction is warranted. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 881 (9th Cir. 2003).

"In the trademark context, 'state common law claims of unfair competition and actions pursuant to the California Business and Professions Code [section] 17200 are substantially congruent to claims made under the Lanham Act.'" *Alixir Co. v. Qué Onda Beverage, Inc.*, No. 2:20-cv-08368-RGK (RAOx), 2021 WL 971057, at *6 (C.D. Cal. Jan. 6, 2021) (quoting *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994)).[3]

## IV. DISCUSSION

The *Winter* factors support entering a preliminary injunction in this case.

### A. MARS is Likely to Succeed on the Merits, at Least with Respect to Likelihood of Confusion

MARS is likely to succeed on the merits with regard to Defendants' alleged trademark infringement. The "critical determination" is whether Defendants' use of the "XMARS" Mark "creates a likelihood that the consuming public will be confused as to who makes what product." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008) (internal quotation marks and citations omitted).

The Ninth Circuit has set forth eight factors a court should consider in determining whether two marks are confusingly similar. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979), *abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003). The *Sleekcraft* factors are: (1) strength of the mark, (2) proximity or relatedness of the goods, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) type of goods and the degree of care likely to be exercised by the purchasers, (7) defendant's intent in selecting the mark, and (8) likelihood of expansion of product lines. *Id.*

A court need not address all eight factors, as "it is often possible to reach a conclusion . . . after considering only a subset of the factors." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999); *see Fortune*

---

[3] Both parties appear to agree with this principle, as their briefs focus on the Lanham Act claim. The Court therefore follows the parties' lead by similarly focusing its analysis on the Lanham Act claim.

1  *Dynamic, Inc. v. Victoria Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030
2  (9th Cir. 2010) ("This eight-factor analysis is 'pliant,' illustrative rather than
3  exhaustive, and best understood as simply providing helpful guideposts."). Indeed,
4  "[s]ome of the *Sleekcraft* factors will be more important in certain contexts than in
5  others." *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 986 (C.D. Cal. 2002).

The Court finds the following important factors establish a likelihood of confusion.

   *1.  Strength of MARS's Marks*

A mark's strength is measured in terms of its "conceptual strength" and "commercial strength." *JL Beverage Co., LLC, v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016) (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000)).

Conceptual strength refers to where a mark falls along the "spectrum of five categories ranging from strongest to weakest: arbitrary, fanciful, suggestive, descriptive, and generic." *Id.* at 1107. "Arbitrary and fanciful marks, which employ words and phrases with no commonly understood connection to the product, are the two strongest categories, and trigger the highest degree of trademark protection." *Id.* (internal quotation marks omitted). "In the middle of the spectrum are suggestive marks, which suggest a product's features and require consumers to exercise some imagination to associate the suggestive mark with the product." *Id.* (citing *Fortune Dynamic*, 618 F.3d at 1033). "[U]nlike arbitrary or fanciful marks which are typically strong, suggestive marks are presumptively weak." *Brookfield Commc'ns*, 174 F.3d at 1058.

Here, the "MARS" Marks are arbitrary, or at the very least fanciful. The word or mark "MARS" has no "commonly understood connection" to advertisement and e-commerce services outside of MARS's use of the marks. *JL Beverage Co.*, 828 F.3d at 1107. Defendants argue "MARS" is conceptually weak because it incorporates the use of "MAR-" which is a widespread element of many words.

(Opp'n 15.) Defendants' argument is misplaced. Defendants mistakenly focus on the strength of a narrow portion of the mark rather than the mark in its entirety. Thus, based solely on the conceptual strength of the entire mark, the arbitrary or fanciful "MARS" Marks are presumptively strong.

"Commercial strength 'is based on actual marketplace recognition.'" *JL Beverage Co.*, 828 F.3d at 1107 (quoting *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011)). And evidence of commercial strength "can transform a suggestive mark into a strong mark, where, for example, that mark has achieved actual marketplace recognition." *See Brookfield Commc'ns*, 174 F.3d at 1058 (internal citation omitted).

Here, MARS convincingly argues that its reputation, client base, services, and work product have achieved actual marketplace recognition. MARS has been operating under the "MARS" Marks for fifty-two years and in that time has "managed, billed, and executed billions of dollars of marketing services." (Mot. 5.) MARS also submits that through its success and millions of dollars spent on promotional efforts, MARS has retained large, "household name" clients such as: Hallmark, Samsung, Crayola, 7-Eleven, Anheuser-Busch, Coco-Cola, Keurig-Dr. Pepper, Pfizer, and Kraft Heinz. (*Id.* at 6.) Based on the high level of commercial success of MARS, the MARS's Marks are strong marks.

Accordingly, the Court finds that the "MARS" Marks are strong marks, based on the Marks being both arbitrary or fanciful, and commercially strong. Thus, the strength of the marks weighs in favor of finding a likelihood of confusion.

   *2.     Relatedness of Goods*

The test for related goods or services is whether the two products "would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1212 (9th Cir. 2012) (*quoting Sleekcraft*, 599 F.2d at 348 n.10). When both products are offered in the same general industry, they are related. *Pom Wonderful LLC v. Hubbard*,

775 F.3d 1118, 1127 (9th Cir. 2014). "To determine whether goods are related, courts may consider whether the goods are complementary, whether the products are sold to the same class of purchasers, and whether the goods are similar in use and function." *Groupion, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1074 (N.D. Cal. 2012).

Here, advertising, marketing services, and e-commerce promotions are related goods. Although Defendants may protest and attempt to differentiate themselves as a technology and AI service provider, (Opp'n 1), their "XMARS" website and services offered on Amazon's Ad Partner Database demonstrate otherwise. (Mot.; Reply 4–5.) Defendants' online webpages clearly demonstrate that "XMARS" operates as an advertising and e-commerce service. (Mot. 8; Hough Decl. Exs. U–V, ECF Nos. 19-22, 19-23.) These services are similar in use and function to MARS's services.

Accordingly, in the same way that courts have found beer and whiskey to be related goods, even though they may occasionally serve different consumer markets, *see Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 155 (9th Cir. 1963), this Court finds that MARS's and Defendants' services are related, thereby weighing in favor of a finding of likelihood of confusion.

3. *Similarity of Marks*

"Three principles guide a court in determining whether marks are similar." *JL Beverage Co.*, 828 F.3d at 1109 (citing *Fortune Dynamic*, 618 F.3d at 1032). "First, similarity is best adjudged by appearance, sound, and meaning." *Id.* (internal quotation marks omitted). "Second, the marks must be considered in their entirety and as they appear in the marketplace." *Id.* "Third, similarities are weighed more heavily than differences." *Id.*

Here, the marks are similar. Yes, MARS and "XMARS" are *technically* different words and, yes, MARS's brand logo is colored red while the "XMARS" brand logo is colored blue. (*See* Mot. 12.) But similarities weigh more heavily than differences, *JL Beverage Co.*, 828 F.3d at 1109, and both marks use nearly identical

words in their brand names, on their websites, and in their promotional advertisements. When appearing in written text or spoken aloud, the superficial distinctions between MARS and "XMARS" melt away. Similarly, when "mars" is searched in an online database, MARS and "XMARS" often appear next to each other in the same results. This was apparent in the "Amazon Ad Partner Database" search whereby, when searching "mars," both MARS and "XMARS" appeared offering nearly identical advertisement and e-commerce services. (*See* Reply 3–4.) When the marks are considered "in their entirety and as they appear in the marketplace," *JL Beverage Co.*, 828 F.3d at 1109, it is easy to see how a consumer might mistakenly believe that "XMARS" is the correct e-commerce advertisement service when—in reality—the consumer was actually looking for MARS. *See J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1462–63 (Fed. Cir. 1991) ("A family of marks is a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates . . . the common characteristic of the family, with the trademark owner.").

Thus, the Court finds that the marks are similar, and this factor also weighs in favor of finding a likelihood of confusion.

### 4. Actual Confusion

Although this factor does not weigh in favor of a likelihood of confusion in this case, it is worth mentioning that MARS does not present any evidence of actual confusion.[4] (*See* Opp'n 13.) "Nevertheless . . . because of the difficulty in garnering evidence of actual confusion, the failure to prove instances of actual confusion is not dispositive." *JL Beverage Co.*, 838 F.3d at 1111 (internal quotation marks and brackets omitted).

---

[4] After the Court heard argument and received evidence from the parties, and after the Court took the Motion under submission, MARS filed a Request for Leave to File New Evidence in Support of the Motion. (Req., ECF No. 71.) This improper and belated request is **DENIED**.

5.  *Intent*

Similarly, it is worth noting that Defendants claim their "XMARS" Mark stood for "X – SparkX, M – Marketplace, A – Advertising, R – Revolutionary, S – System," and "had nothing to do with [MARS]." (Opp'n 18; Decl. Damon Gjording ("Gjording Decl."), ECF No. 35-1.) But even accepting this as true, "[a]bsence of malice is no defense to trademark infringement." *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1132 n.12 (9th Cir. 1998).

In sum, based on the strength of MARS's Marks, the relatedness of goods, and the similarity of the parties' marks, the Court finds that there is a likelihood of confusion as to the source of services offered by MARS and "XMARS." Accordingly, the Court also finds that MARS is likely to succeed on the merits for its infringement claims. *See Jada Toys*, 518 F.3d at 632 (finding consumer confusion as the "critical determination" in an infringement claim to find a likelihood of success on the merits).

### B.  MARS is Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief

MARS shows a likelihood of success on the merits; thus, it is entitled to a rebuttable presumption of irreparable harm.

On December 27, 2020, Congress codified the rule that a plaintiff seeking a preliminary injunction to enjoin trademark infringement "shall be entitled to a rebuttable presumption of irreparable harm upon a finding of . . . likelihood of success on the merits." 15 U.S.C. § 1116. The statute is clear.

While there is no rigid formula to rebut the presumption of irreparable harm, courts have generally found certain types of evidence to be particularly forceful in the inquiry. First, a plaintiff's undue delay in seeking injunctive relief may negate the notion of irreparable harm. *See Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (explaining that "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm" (quoting *Oakland Tr., Inc. v. Chron. Publ'g Co.*, 762 F.3d 1374, 1377 (9th Cir. 1985))). The Ninth Circuit has noted, however, that

delay in seeking injunctive relief is often insufficient on its own to refute a determination of irreparable harm. *See id.* ("Usually, delay is but a single factor to consider in evaluating irreparable injury; indeed, courts are loath to withhold relief *solely on that ground*." (internal quotation marks omitted)).

Second a showing of purely pecuniary injuries negates a plaintiff's claim of irreparable harm because the essence of an equitable remedy is that legal remedies are inadequate. *See L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202–03 (9th Cir. 1980) (noting that "[t]he basis of injunctive relief in the federal courts is irreparable harm and inadequacy of legal remedies"). Third, if "the non-movant has or will soon cease the allegedly infringing activities," the harm is not considered irreparable. *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir. 1996).

Here, Defendants attempt to rebut the presumption by relying solely on the argument that MARS's "undue delay in seeking relief demonstrates that [MARS] will not suffer irreparable in the absence of an injunction." (Opp'n 9.) Defendants argue that—at the very least—MARS knew of Defendants' use of the "XMARS" Mark starting on August 19, 2023. (Mot. 10–11; Surresponse 3.) The crux of Defendants' argument is that MARS operated its advertising and e-commerce business with full knowledge of "XMARS" for at least nine months before bringing the present action on April 26, 2024. However, even assuming *arguendo* that MARS knew of the "XMARS" Mark starting on August 19, 2023, Defendants' sole reliance on MARS's delay does not meet the threshold necessary to rebut the presumption of irreparable harm. As the Ninth Circuit noted in *Cuviello*, sole reliance on delay in seeking injunctive relief is often insufficient on its own to refute a determination of irreparable harm. 762 F.3d at 833; *see also Doe v. Horne*, No. 23-16026, --- F.4th ---, 2024 WL 4113838, at *19 (9th Cir. Sept. 9, 2024) (finding delay of seven months did not, alone, undermine the plaintiffs' showing of irreparable harm). This is precisely the case here.

In their surresponse, Defendants attempting to undercut the testimony and declarations of two MARS employees who claim MARS leadership did not discover the usage of XMARS until April 17, 2024. (*See* Surresponse 1.) However, the Court does not find this line of argument dispositive at this stage. MARS, in its surreply, explained that its employees did not realize that any pre-April 2024 communications/ notifications included information related to "XMARS," thereby leveling the field on the issue and leaving the presumption undisturbed. (Surreply 1–2.)

As likelihood of confusion would presumptively cause irreparable harm, and as Defendants fail to rebut that presumption, the Court finds that MARS has established a likelihood of irreparable harm in the absence of preliminary injunctive relief.

**C.     The Balance of Equities Depends on the Preliminary Injunction Terms**

Defendants represent that "[a]n injunction requiring Xmars to change its name now will do substantial and irreparable damage." (Opp'n 19; *see* Gjording Decl. ¶ 44.) Additionally, Defendants argue that an injunction would "alter the status quo and force Defendants to do a complete rebranding . . . after Xmars had already built its business and reputation around the XMARS mark, and after it had obtained approval of federally-registered trademarks." (*Id.*) Here, because Defendants *did* properly obtain a registered trademark through the USPTO in May 2024, the Court finds the balance of equities only tips in MARS's favor if Defendants' hardship can be mitigated. Relevantly, it is typical for trademark settlements to provide for grace periods during which an infringing mark is phased out with impunity. Implementing a six-month grace period here would allow Defendants time to phase out the use of "XMARS," and then to rebrand or rollback their brand as they may desire.[5]

---

[5] Defendants argue that MARS seeks a mandatory, not prohibitory, injunction, meaning that MARS bears a heightened burden and the equities favor Defendants. (Opp'n 19.) A prohibitory injunction preserves the status quo by freezing "the positions of the parties until the court can hear the case on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quoting *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983)). In contrast, a mandatory injunction "orders a responsible party to 'take action.'" *Id.* (quoting *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996)). Here, MARS seeks an order prohibiting Defendants from infringing the MARS's Marks. (Mot. 1, 22.) What Defendants do with their branding thereafter is up to them.

Accordingly, the Court finds that, with a six-month grace period, the balance of equities favors a preliminary injunction.

### D. The Public Interest Weighs in Favor of a Preliminary Injunction

Lastly, the public has an "interest in protecting trademarks." *Brookfield Commc'ns*, 174 F.3d at 1066. Essentially, this factor almost always favors the trademark owner. Thus, the Court finds that the public interest weighs in favor of granting a preliminary injunction.

Accordingly, on balance, all four *Winter* factors support granting a preliminary injunction, provided Defendants are given six months' grace to phase out their use of the "XMARS" Marks.

### E. A Security Bond is Not Required

Defendants correctly note that Federal Rule of Civil Procedure 65(c) permits a court to grant preliminary injunctive relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." (Opp'n 20 (citing Fed. R. Civ. P. 65(c).) Defendants suggest that a security bond amount of no less than $5 million is proper and necessary here. (*Id.*; Gjording Decl. ¶ 45.)

Despite the seemingly mandatory language, "Rule 65(c) invests the district court 'with discretion as to the amount of security required, *if any.*'" *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (quoting *Barahona–Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)). In particular, "[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.*; *see Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). The Ninth Circuit has found that the language of Rule 65(c) does not absolve the party affected by the injunction from its obligation of presenting evidence that a bond is needed, such that the district court is afforded an opportunity to exercise its discretion in setting the amount of the bond. *Conn. Gen.*, 321 F.3d at 883.

Here, Defendants argue MARS's "requested injunction would do substantial and irreparable harm to the goodwill that Xmars has built since 2022, embodied by its registered XMARS mark." (Opp'n 20; Gjording Decl. ¶¶ 44–46.) Defendants further state that, if "required to stop using this mark, Xmars will not only lose substantial sales, but also will suffer reputational damage, causing it to likely lose its market leading status among Amazon Ads Partners." *Id.* However, Defendants do not support these blanket arguments with any substantive evidence and "the language of Rule 65(c) does not absolve the party affected by the injunction from its obligation of presenting evidence that a bond is needed." *Conn. Gen.*, 321 F.3d at 883. As such, Defendants fail to meet their burden to show a security bond is required.

Additionally, with a six-month grace period to allow Defendants to slowly discontinue and/or transition away from their usage of the "XMARS" Mark, any perceived harm resulting from the preliminary injunction will be mitigated. Therefore, the Court finds that a security bond is not required for this preliminary injunction.

## V.   CONCLUSION

For the reasons discussed above, the Court **GRANTS** MARS's Motion for a Preliminary Injunction, without a security bond, and with a **SIX-MONTH GRACE PERIOD** to wind down the use of "XMARS," as detailed below. (ECF No. 19.)

**A.** Defendants Xmars Corp. d/b/a/ Xmars, Inc., SparkX Global Corp. and SparkX Marketing Co., Limited, and each of their respective owners, officers, directors, agents, servants, employees and representatives, and those persons in active concert or participation with any of them, are enjoined and restrained, from:

> **(1)** using MARS or XMARS to designate the source of any advertising or marketing services, data analytic services, software services and/or any other services provided by Defendants, effective as of six-months following the date of this Order;

**(2)** using MARS or XMARS to state or suggest that Defendants' services originated with Plaintiff, or that there is any affiliation or connection between Plaintiff and Defendants or their respective services, effective as of the date of this Order; and

**(3)** taking any action for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (1) and (2) above, effective as of the date of this Order.

**B.** Defendants shall file with this Court and serve upon Plaintiff a joint written report setting forth in detail the manner in which each Defendant has complied with the requirements of this Order. Defendants shall file this status report on the first day of each month beginning on **October 1, 2024**, and continuing through the completion of the six-month grace period.

This Order shall remain in full force and effect through the date of the Final Judgment in this case and through the sooner of the end of any appeal therefrom or the expiration of the time for filing an appeal.

**IT IS SO ORDERED.**

September 13, 2024

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**